ADAM B. WOLF (Cal. Bar No. 215914)
awolf@peifferwolf.com
MELISA A. ROSADINI-KNOTT (Cal. Bar No. 316369)
mrosadini@peifferwolf.com
PEIFFER WOLF CARR KANE CONWAY & WISE, LLP
5042 Wilshire Blvd., No. 304
Los Angeles, CA 90036
Tel.: (415) 766-3545
Fax: (415) 402-0058

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| E.F., an individual; and G.H., an individual,<br><br>　　　Plaintiffs,<br><br>　　v.<br><br>FUJIFILM IRVINE SCIENTIFIC, INC.,<br><br>　　　Defendants. | Case No.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br>1. STRICT PRODUCTS LIABILITY—MANUFACTURING DEFECT<br>2. STRICT PRODUCTS LIABILITY—DESIGN DEFECT<br>3. STRICT PRODUCTS LIABILITY—FAILURE TO WARN<br>4. NEGLIGENCE<br>5. NEGLIGENT FAILURE TO RECALL |

Plaintiffs E.F. and G.H. (collectively, "Plaintiffs") respectfully bring this Complaint against Defendant FUJIFILM IRVINE SCIENTIFIC, INC. (hereinafter, "Irvine Scientific" or "Defendant"), and allege as follows:

## NATURE OF THE ACTION

1. Defendant's defective product and negligent conduct destroyed Plaintiffs' precious and irreplaceable embryos.

2. Irvine Scientific manufactured, marketed, promoted, distributed, and/or sold oil to be used for culturing and storing human embryos. Irvine Scientific further marketed that its oil would protect embryos from changes in osmolality and pH, among other things, which is necessary to ensure that stored human embryos survive and remain viable for implantation.

3. Irvine Scientific further represented that it properly and adequately tested its oil before distributing such oil to the public, including clinics and/or healthcare practitioners who would use such oil for the storage of human embryos.

4. Despite these representations, Irvine Scientific did not sufficiently test the oil that it manufactured, marketed, promoted, distributed, and/or sold. As a result, it sold defective lots of oil, which turned out to be toxic to embryos.

5. Irvine Scientific's manufacturing, marketing, promoting, distributing, and/or selling its toxic oil resulted in the death of Plaintiffs' embryos.

6. Only after Plaintiffs' embryos died upon coming into contact with Defendant's defective oil did Irvine Scientific recall multiple lots of its oil, including a lot that ruined Plaintiffs' embryos.

## PARTIES

7. Plaintiff E.F. is a citizen of Ada County, Idaho.

8. Plaintiff G.H. is a citizen of Ada County, Idaho.

9. Given the sensitive nature of their claims, Plaintiffs E.F. and G.H. request this Court to grant a protective order pursuant to Federal Rule of Civil Procedure 26(c) to permit them to proceed under pseudonyms to ensure Defendants

keep Plaintiffs' identity confidential throughout the pendency of the lawsuit and thereafter.*

10. Defendant Irvine Scientific is, and at all relevant times herein was, a corporation organized under the laws of the State of California, with its principal place of business in the Central District of California, specifically Orange County, California.

11. Irvine Scientific markets itself as having "over 50 years of focus in the development and optimization of cell culture media" and providing products and services in the assisted reproductive technology ("ART") field.

12. At all relevant times herein, Irvine Scientific was and is authorized to conduct business within the State of California, and distributed its products, including the above-referenced oil, within the State of California.

13. Plaintiffs reserve the right, pursuant to Federal Rules of Civil Procedure 15, to seek leave to identify additional parties, whom Plaintiffs are currently unaware of, who are responsible for Plaintiffs' harm, as alleged herein.

## JURISDICTION AND VENUE

14. Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over the entire action by virtue of the fact that this is a civil action between parties that are citizens of different states and wherein the matter in controversy exceeds $75,000, exclusive of interest and costs.

15. This Court has personal jurisdiction over all Defendants. Each Defendant is, and at all relevant times herein was, a citizen of and/or authorized to conduct business in the State of California and/or conducted such business within the State of California, including the actions, dealings, and/or omissions that caused or contributed to the harm giving rise to this action.

---

* Plaintiffs intend to file a motion for protective order, if requested by the Court or Defendant, to proceed under pseudonyms.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant Irvine Scientific's principal place of business is within this District and is a resident of this District pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL FACTUAL ALLEGATIONS

### General Background of Assisted Reproductive Technology

17. ART involves fertility-related treatments in which human eggs or embryos are manipulated. The most common type of ART is in vitro fertilization ("IVF"). Since the first successful IVF procedure in humans, dating back to at least the 1970s, IVF and other forms of ART have developed and expanded significantly worldwide.

18. During the IVF process, eggs are extracted from a woman and fertilized in a laboratory with sperm to create a viable embryo. Later in the IVF process, the embryo is transplanted into a uterus.

19. The process of extracting human eggs from a woman is a lengthy process, typically requiring significant medication, monitoring through ultrasound and other scans to check the development of the eggs, and performing a surgical procedure to collect the eggs.

20. Following the collection of the eggs, sperm is mixed with the eggs in a laboratory to create embryos.

21. Many people, including Plaintiffs, elect to have their embryos stored for a period of time before the embryo is transferred to a woman's uterus.

22. There can be many reasons for undergoing these expensive and extensive procedures well in advance of the embryo implantation, including that human eggs are a limited and precious resource. A woman has a limited number of eggs at birth, and this supply diminishes as part of the natural aging process (commonly referred to as a "biological clock"). Moreover, not only does the quantity of a woman's eggs diminish with time, but so does a woman's egg quality, with miscarriages and chromosomal abnormalities occurring more frequently for

women who are older at the time of a natural conception and pregnancy. The most determinative factor in IVF success is the woman's age when her eggs were extracted.

23. Thus, one purpose of embryo preservation and storage is to allow women and/or their reproductive partners to preserve their reproductive material so that the embryos may be implanted at a later time while preserving viable eggs and embryos and allow for flexibility in family planning.

24. As part of the embryo preservation and storage process, oil is used to prevent evaporation and insulate against changes in pH, among other things. This oil, which must be free of contaminants, is vital to preventing damage to or destruction of the embryos.

25. Irvine Scientific describes such oil as "highly purified by-products of the distillation of petroleum, and hav[ing] the properties of being immiscible with aqueous solutions, having a significantly lighter density than water, and being non-reactive." Moreover, according to Irvine Scientific's own marketing materials, "[t]his makes them ideal for use in micro-drop cell cultures, preventing evaporation of the aqueous phase, and proving an insulation against rapid changes in pH when the atmospheric (i.e. % $CO_2$) conditions change."

### Irvine Scientific's Oil

26. Irvine Scientific marketed and promoted its oil for use as an overlay to cover small volumes of media to prevent evaporation and changes in pH.

27. Irvine Scientific further marketed and represented that its oil is sterile filtered and aseptically processed to provide the highest quality oil available.

28. Moreover, Irvine Scientific marketed that all of its oil was properly tested, and thus that it could be relied upon and/or posed no harm in use with human embryos.

29. Defendant manufactured, marketed, distributed, and/or sold its oil while promoting that its oil was tested by superior methods, *e.g.*, a Mouse Embryo Assay, to ensure that no embryotoxic exposure would occur.

30. However, Irvine Scientific knew or should have known that its oil was not properly and/or adequately tested and/or inspected for embryotoxicity, and thus posed a severe risk of destruction to human embryos.

**Irvine Scientific's January 2023 Recall of Its Oil for Embryo Culture**

31. On or about January 16, 2023, Irvine Scientific issued an "Urgent Field Safety Notice (product removal)" sent to its customers and users of its oil (the "Recall Letter").

32. The Recall Letter stated that Irvine Scientific was recalling its "Oil for Embryo Culture, Catalog #9305, Lots 0000011351, 0000011367, 0000015999, 00000160001." The recalled embryo oil lots are referred to herein as the "Recalled Oil Lots."

33. In the Recall Letter, Irvine Scientific acknowledged that it had received several complaints regarding its Recalled Oil Lots, including the death of human embryos upon coming into contact with the oil.

34. Moreover, Irvine Scientific's Recall Letter stated that—only after receiving these reports of defective oil—did Irvine Scientific test the reported lots and found oil toxicity for many of its oil lots.

35. On information and belief, Irvine Scientific previously has manufactured and sold numerous products used in ART, including oil, that were defective and sometimes recalled.

**Plaintiffs Learned Their Embryos Had Been Destroyed Due to the Recalled Embryo Oil Lots**

36. Plaintiffs utilized ART in order to fulfill their dream of having children. To that end, Plaintiffs entrusted a fertility clinic to create their embryos and store

those embryos safely for a short period of time—when Plaintiffs would transfer their embryos to have one or more children.

37. Plaintiffs learned from their fertility clinic that their embryos were killed upon coming into contact with Defendant's oil. Those embryos were viable prior to coming into contact with Defendant's oil, and then were killed by Defendant's oil.

38. Shortly after Irvine Scientific issued its Recall Letter, Plaintiffs were informed by their fertility clinic that the oil that killed their embryos was part of the Recalled Embryo Lots.

39. Plaintiffs are devastated. They may no longer be able to have children with their genetic material as a result of Defendant's conduct.

**Irvine Scientific Knew or Should Have Known That the Recalled Embryo Oil Lots Posed an Unreasonable Risk of Toxicity to Viable Embryos**

40. As a manufacturer and distributor of numerous ART products, including oil, Irvine Scientific knew that contaminated and/or toxic oil could kill human embryos upon contact. Accordingly, Defendant knew it was vitally important that its oil was properly tested and/or inspected prior to the distribution of such oil.

41. Despite this, Irvine Scientific failed to properly inspect and/or test its oil, including the Recalled Oil Lots. Defendant knowingly put its oil into the market when it knew or should have known that the Recalled Oil Lots posed a substantial and unacceptable risk to human embryos, including Plaintiffs' embryos.

42. As a manufacturer of numerous products for use in ART, Irvine Scientific knew that people go to extraordinary lengths to obtain and use viable human embryos. Defendant knew that people place extreme value on their viable embryos, make substantial emotional and financial investments for their embryos, and that such people expect that great care will be taken to preserve and protect the embryos to avoid the irreparable harm of the death of their embryos.

43. Defendant's conduct was despicable and was carried on by Defendant with a willful and conscious disregard of the rights and/or safety of others.

Defendant's conduct subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights.  Moreover, as discussed herein, Defendant's conduct amounted to a deceit and/or concealment of material fact(s) known to Defendant with the intention on the part of Defendant to deprive individuals of property and/or legal rights and/or otherwise cause injury.

## FIRST CAUSE OF ACTION

## STRICT PRODUCTS LIABILITY—MANUFACTURING DEFECT

44. Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

45. At all times relevant herein, Irvine Scientific manufactured, distributed, and/or sold oil to be used with human embryos, including the Recalled Embryo Oil Lots.

46. At the time the Recalled Embryo Lots left Irvine Scientific's possession, the Recalled Embryo Lots contained a manufacturing defect such that they differed from Irvine Scientific's intended result.  This deviation included, but was not necessarily limited to, toxicity in the Recalled Embryo Oil Lots, such that the Recalled Embryo Lots posed a fatal harm to human embryos upon their contact with human embryos.

47. Oil from the Recalled Embryo Oil Lots was used (as intended), and it came into contact with Plaintiffs' embryos, which resulted in the tragic destruction of Plaintiffs' embryos.

48. The defect in the oil in the Recalled Embryo Oil Lots was a substantial factor in causing Plaintiffs' harm.

49. Irvine Scientific acted with a conscious disregard for the safety of consumers and/or users of its Embryo Oil, including Plaintiffs, because, without limitation, Irvine Scientific was aware of the dangerous consequences of not properly or adequately testing its Embryo Oil Lots (including specifically the Recalled

Embryo Oil Lots), when it knew or should have known the oil (specifically, the Recalled Embryo Oil Lots) was not safe and posed a serious, toxic risk to irreplaceable human embryos, and failing to recall the Recalled Embryo Oil Lots before the oil came into contact with Plaintiffs' embryos.

## SECOND CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY—DESIGN DEFECT

50. Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

51. Irvine Scientific designed, manufactured, distributed, and/or sold oil, including the Recalled Embryo Oil Lots, or caused such oil to be designed, manufactured, and/or sold.

52. The Recalled Embryo Oil Lots did not perform as safely or as effectively as an ordinary consumer would have expected it to perform when used or misused in a reasonably foreseeable manner.

53. Irvine Scientific had actual or constructive notice and knew, or in the exercise of reasonable care and diligence should have known, that the Recalled Embryo Oil Lots were defective in their design as discussed herein, including but not limited to their composite materials, resulting in the irreversible damage and destruction of Plaintiffs' embryos.

54. The benefits of the Recalled Embryo Oil Lots are not outweighed by their risks, particularly considering the potential harm resulting from their use on reproductive materials, including embryos; the likelihood of harm occurring; the feasibility of an alternative safer design at the time of manufacture; and the feasibility of more reliable testing methods and procedures.

55. Irvine Scientific had actual or constructive notice and knew, or in the exercise of reasonable care should have known, that the Recalled Embryo Oil Lots had significant risks, were defective in design, as discussed herein, and had an

unreasonable increased risk of damage or destruction to stored reproductive materials, including embryos.

56. Plaintiffs were irreparably harmed because the Recalled Embryo Oil Lots were toxic and/or contained materials that were toxic when coming into contact with stored embryos, such as those belonging to Plaintiffs.

57. As a direct and proximate result of the defective designs of the Recalled Embryo Oil Lots, Plaintiffs were harmed as described herein, including but not limited to the destruction of their embryos.

58. The failure of the Recalled Embryo Oil Lots to perform safely and effectively was a substantial factor in causing Plaintiffs' harm and damages.

59. Irvine Scientific acted with a conscious disregard for the safety of consumers and/or users of its Embryo Oil, including Plaintiffs, because, without limitation, Irvine Scientific was aware of the dangerous consequences of not properly or adequately testing its Embryo Oil Lots (including specifically the Recalled Embryo Oil Lots), when it knew or should have known the oil (specifically, the Recalled Embryo Oil Lots) was not safe and posed a serious, toxic risk to irreplaceable human embryos, and failing to recall the Recalled Embryo Oil Lots before the oil came into contact with Plaintiffs' embryos.

## THIRD CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY—FAILURE TO WARN

60. Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

61. Irvine Scientific designed, manufactured, distributed, and/or sold oil to be used with human embryos, including the Recalled Embryo Oil, and/or caused such oil to be designed, manufactured, distributed, and/or sold.

62. The Recalled Embryo Oil Lots had risks, including but not limited to embryotoxicity, that were known and/or knowable in light of the generally accepted scientific knowledge at the time of manufacture, distribution and/or sale.

63. The risks of contaminated oil, including the Recalled Oil Lots, presented a substantial danger, including but not limited to embryotoxicity and destruction of viable embryos, when such oil was used as intended and/or in a reasonably foreseeable manner.

64. Despite its awareness that its oil, including the Recalled Oil Lots, was defective and contained an unacceptably increased danger to embryos, Irvine Scientific failed to warn consumers, including but not limited to Plaintiffs and Plaintiffs' fertility providers who purchased the oil, that the oil had not been properly and/or sufficiently tested, contained toxic raw materials, and/or had an increased risk of embryotoxicity.

65. Neither Plaintiffs nor their fertility providers knew or would have known or recognized the risks of the Recalled Embryo Oil Lots.

66. As a direct and proximate result of Irvine Scientific's failure to adequately warn of the dangerous and embryotoxic effects of the Recalled Embryo Oil Lots, Plaintiffs were harmed as described herein, including but not limited to the destruction of their embryos.

67. The lack of sufficient warnings was a substantial factor in causing Plaintiffs' harm and damages. Contaminated and harmful oil would not have been used with Plaintiffs' embryos if Defendant had provided sufficient warning in advance.

68. Irvine Scientific acted with a conscious disregard for the safety of consumers and/or users of its Embryo Oil, including Plaintiffs, because, without limitation, Irvine Scientific was aware of the dangerous consequences of not properly or adequately testing its Embryo Oil Lots (including specifically the Recalled Embryo Oil Lots), when it knew or should have known the oil (specifically, the

Recalled Embryo Oil Lots) was not safe and posed a serious, toxic risk to irreplaceable human embryos, and failing to recall the Recalled Embryo Oil Lots before the oil came into contact with Plaintiffs' embryos.

## FOURTH CAUSE OF ACTION
## NEGLIGENCE

69. Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

70. Irvine Scientific designed, manufactured, distributed, and/or sold oil for use with human embryos, including the Recalled Embryo Oil Lots, or caused such oil to be designed, manufactured, and/or sold.

71. As a manufacturer of oil for use with human embryos, Irvine Scientific owed a duty, including but not limited to Plaintiffs, to design, manufacture, inspect, and/or test its oil, including the Recalled Embryo Oil Lots, such that its oil was not toxic or hazardous when used on human embryos and/or did not contain toxic or contaminated materials.

72. Irvine Scientific breached this duty and was negligent in its design, manufacture, inspection, and/or testing of its oil, including the Recalled Embryo Oil Lots.

73. As a direct and proximate result of Irvine Scientific's negligent acts and/or omissions, including but not limited to its failure to properly or adequately test its oil (including the Recalled Embryo Oil Lots), promoting and marketing its oil as properly tested and safe for use on human embryos despite its knowledge of its contamination, defective design of its oil, defective manufacture of its oil, and/or failure to adequately warn of the dangerous and embryotoxic effects of the Recalled Embryo Oil Lots, Plaintiffs were harmed as described herein, including but not limited to the destruction of their embryos.

74. These negligent acts and/or omissions were a substantial factor in causing Plaintiffs' harm and damages.

75. Irvine Scientific acted with a conscious disregard for the safety of consumers and/or users of its Embryo Oil, including Plaintiffs, because, without limitation, Irvine Scientific was aware of the dangerous consequences of not properly or adequately testing its Embryo Oil Lots (including specifically the Recalled Embryo Oil Lots), when it knew or should have known the oil (specifically, the Recalled Embryo Oil Lots) was not safe and posed a serious, toxic risk to irreplaceable human embryos, and failing to recall the Recalled Embryo Oil Lots before the oil came into contact with Plaintiffs' embryos.

## FIFTH CAUSE OF ACTION
## NEGLIGENT FAILURE TO RECALL

76. Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

77. At all times relevant herein, Irvine Scientific manufactured, distributed, and/or sold oil for use with human embryos, including the Recalled Embryo Oil Lots.

78. As a manufacturer of oil for use with human embryos, Irvine Scientific owed a duty, including but not limited to Plaintiffs, to design, manufacture, inspect, and/or test its oil, including the Recalled Embryo Oil Lots, such that its oil was not toxic or hazardous when used on human embryos and/or did not contain toxic or contaminated materials. Further, Irvine Scientific had an ongoing duty following its manufacture, distribution, and/or sale of its oil, including the Recalled Embryo Oil Lots, to inform purchasers, consumers, and/or others who used its oil that the oil was toxic and/or hazardous and/or contained toxic or contaminated materials harmful to human embryos, and to immediately recall and/or remove such oil from the market to prevent harm.

79. Irvine Scientific breached these duties and acted negligently by failing to recall its Recalled Embryo Oil Lots earlier, including before such oil came into contact with Plaintiffs' embryos.

80. For a significant period of time before it issued the recall of its Recalled Embryo Oil Lots, Irvine Scientific knew and/or should have known that, when used as intended, its Recalled Embryo Oil Lots were not properly or adequately tested for, among other things, toxicity, and posed an unreasonable increased risk in toxicity to embryos.

81. Irvine Scientific knew, and/or reasonably should have known that the defects in its oil, including the Recalled Embryo Oil Lots, posed a substantial risk of serious injury to the embryos with which the oil came into contact and/or was used.

82. Irvine Scientific knew and/or reasonably should have known that it had failed to properly or adequately test its Recalled Embryo Oil Lots before distributing and/or selling and/or causing such oil from entering the market.

83. A reasonable manufacturer, distributor, and/or seller in the same or similar circumstances would have recalled the oil and issued a notice to purchasers, consumers, and/or users—prior to the oil coming into contact with Plaintiffs' embryos—rather than continuing to allow the oil to be used, sold, distributed, and/or manufactured, thereby obfuscating the true risks of the oil to human embryos.

84. Despite the fact that it knew or should have known that the Recalled Embryo Oil Lots were defective, toxic, and posed an unacceptable risk of toxicity to embryos, Irvine Scientific failed to recall the oil.

85. Irvine Scientific acted with a conscious disregard for the safety of consumers and/or users of its Embryo Oil, including Plaintiffs, because, without limitation, Irvine Scientific was aware of the dangerous consequences of not properly or adequately testing its Embryo Oil Lots (including specifically the Recalled Embryo Oil Lots), when it knew or should have known the oil (specifically, the Recalled Embryo Oil Lots) was not safe and posed a serious, toxic risk to

irreplaceable human embryos, and failing to recall the Recalled Embryo Oil Lots before the oil came into contact with Plaintiffs' embryos.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

1) For past, present, and future non-economic damages in an amount to be determined at the time of trial;

2) For past, present, and future economic damages in an amount to be determined at the time of trial;

3) For exemplary damages, in an amount to be determined at trial;

4) For costs of suit herein;

5) For pre- and post-judgement interest as allowed by law;

6) For injunctive relief, in order to ensure that Plaintiffs' biological material does not come into contact with any more contaminated oil manufactured by Defendant; and

7) For such other and further relief as the Court may deem just and proper.

Date: February 17, 2023

Respectfully submitted,

_____
Adam B. Wolf (CA Bar No. 215914)
Melisa A. Rosadini-Knott
  (CA Bar No. 316369)
PEIFFER WOLF CARR KANE
CONWAY & WISE, LLP
5042 Wilshire Blvd., No. 304
Los Angeles, CA 90036
T (415) 766-3545
F (415) 402-0058
awolf@peifferwolf.com
mrosadini@peifferwolf.com

*Attorneys for Plaintiffs*

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims so triable.

Date: February 17, 2023

Respectfully submitted,

_____
Adam B. Wolf (CA Bar No. 215914)
Melisa A. Rosadini-Knott
   (CA Bar No. 316369)
PEIFFER WOLF CARR KANE
CONWAY & WISE, LLP
5042 Wilshire Blvd., No. 304
Los Angeles, CA 90036
T (415) 766-3545
F (415) 402-0058
awolf@peifferwolf.com
mrosadini@peifferwolf.com

*Attorneys for Plaintiffs*